Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/17/2025 09:08 AM CDT

State of Nebraska, appellee, v.
Manuel A. Portillo, appellant.

___ N.W.3d ___

Filed June 10, 2025.    No. A-24-489.

1. **Trial: Witnesses.** A district court's decision to permit a party to recall a witness is reviewed for an abuse of discretion.

2. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

3. **Motions for Mistrial: Appeal and Error.** An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the trial court has abused its discretion.

4. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

5. **Effectiveness of Counsel: Constitutional Law: Statutes: Records: Appeal and Error.** Whether a claim of ineffective assistance of counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement.

6. **Effectiveness of Counsel: Appeal and Error.** In reviewing a claim of ineffective assistance of counsel on direct appeal, an appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant

was or was not prejudiced by a defense counsel's alleged deficient performance.

7. **Trial: Pretrial Procedure: Pleadings: Evidence: Juries: Appeal and Error.** A motion in limine is a procedural step to prevent prejudicial evidence from reaching the jury. It is not the office of a motion in limine to obtain a final ruling upon the ultimate admissibility of the evidence. Therefore, when a court overrules a motion in limine to exclude evidence, the movant must object when the particular evidence is offered at trial in order to predicate error before an appellate court

8. **Trial: Evidence: Waiver.** If, when inadmissible evidence is offered, the party against whom such evidence is offered consents to its introduction, or fails to object or to insist upon a ruling on an objection to the introduction of the evidence, and otherwise fails to raise the question as to its admissibility, the party is considered to have waived whatever objection he or she may have had thereto, and the evidence is in the record for consideration the same as other evidence.

9. **Constitutional Law: Trial: Impeachment: Witnesses.** If potentially impeaching information is privileged, the defendant must show that not disclosing it would likely impair the defendant's right of confrontation. If that showing is made, the court can ask the State to seek the witness' consent for an in camera review of the information. If relevant material is found, the witness must choose to allow disclosure or risk having the testimony excluded.

10. **Records: Appeal and Error.** It is incumbent upon an appellant to supply a record which supports his or her appeal. Absent such a record, as a general rule, the decision of the lower court is to be affirmed.

11. **Presumptions: Appeal and Error.** Appellate courts will not presume prejudice based on mere speculation.

12. **Trial: Witnesses.** The applicable standard for when a trial court permits a party to recall a witness prior to resting its case is to review for an abuse of discretion.

13. **Trial: Witnesses: Evidence.** It is not an abuse of discretion to permit the State to recall a witness for the purpose of filling in gaps in proof or to introduce an exhibit that the party had inadvertently failed to offer, as long as the court does not advocate for or advise the State to do so.

14. **Trial: Waiver: Appeal and Error.** The failure to make a timely objection waives the right to assert prejudicial error on appeal.

15. **Trial: Judges: Appeal and Error.** One cannot know of purportedly improper judicial conduct, gamble on a favorable result as to that conduct, and then complain that he or she guessed wrong and does not like the outcome.

16. **Criminal Law: Motions for Mistrial.** A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.

17. **Motions for Mistrial: Proof: Words and Phrases: Appeal and Error.** In order to prove error predicated on the failure to grant a mistrial, the defendant must prove the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. In the context of a denial of a motion for mistrial, actual prejudice means prejudice that is "existing in fact; real."

18. **Trial: Proof: Words and Phrases: Appeal and Error.** Actual prejudice requires a reasonable probability that, but for the errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

19. **Trial: Evidence: Juries.** The issues of credibility and how to weigh conflicting evidence are matters entrusted to the jury to decide.

20. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.

21. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question under the standard of review.

22. ____: ____: ____. The record is sufficient to resolve an ineffective assistance claim on direct appeal if the record establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.

23. **Effectiveness of Counsel: Proof: Appeal and Error.** Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

24. **Effectiveness of Counsel: Proof.** To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

25. **Effectiveness of Counsel: Proof: Words and Phrases.** To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

26. **Rules of Evidence: Other Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith.

27. \_\_\_\_: \_\_\_\_. Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2024) does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime.

28. \_\_\_\_: \_\_\_\_. Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime and evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts. Evidence of other crimes or bad acts is also inextricably intertwined with the charged crime if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime.

29. **Effectiveness of Counsel.** Trial counsel's decisions that amount to reasonable trial strategy do not constitute deficient performance.

30. \_\_\_\_. Decisions about whether to engage in cross-examination, and, if so, to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim.

31. **Effectiveness of Counsel: Appeal and Error.** An appellate court does not use perfect hindsight to criticize unsuccessful trial strategies or second-guess trial strategy.

32. **Effectiveness of Counsel: Trial: Records: Appeal and Error.** It is more the exception than the rule that defense counsel's strategy can be reasonably inferred from the trial record on direct appeal. When the record is devoid as to why trial counsel chose not to ask specific questions, the record is often insufficient to address an ineffective assistance claim on direct review.

33. **Effectiveness of Counsel: Witnesses: Appeal and Error.** When the claim of ineffective assistance on direct appeal involves uncalled witnesses, vague assertions that counsel was deficient for failing to call "witnesses" are little more than placeholders and do not sufficiently preserve the claim.

34. \_\_\_\_: \_\_\_\_: \_\_\_\_. When the claim of ineffective assistance on direct appeal involves uncalled witnesses, the appellate court does not need specific factual allegations as to what the person or persons would have said, which will not be found in the appellate record. It is sufficient that

appellate counsel give on direct appeal the names or descriptions of any uncalled witnesses forming the basis of a claim of ineffective assistance of trial counsel.

Appeal from the District Court for Douglas County: W. Russell Bowie III, Judge. Affirmed.

Keith Dornan and Stuart J. Dornan, of Dornan, Troia, Howard, Breitkreutz, Dahlquist & Klein, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellee.

Pirtle, Bishop, and Welch, Judges.

Pirtle, Judge.

## I. INTRODUCTION

In April 2023, Manuel A. Portillo was charged in the district court for Douglas County with three counts of first degree sexual assault of a child and three counts of incest related to the sexual abuse of his stepdaughter, A.H. After a jury trial, he was convicted of two of the sexual assault charges and two of the incest charges.

On appeal, Portillo assigns 17 errors. In the first 4 assignments of error, he asserts that the district court abused its discretion in a variety of ways; in the next assignment of error, he claims that a rational trier of fact could not have found him guilty beyond a reasonable doubt; and in the final 12 assignments of error, he claims that his trial counsel was ineffective. For the reasons that follow, we affirm.

## II. BACKGROUND

Portillo has been in A.H.'s life for around 10 years and became her stepfather in 2015. On March 25, 2023, when A.H. was 13 years old, she told her mother that Portillo had been sexually abusing her since she was 8 years old. Because A.H. was worried that her mother was not going to help her, she

told her friend's mother later that night. This person contacted a law enforcement officer, who then spoke with A.H. around midnight on March 26 and scheduled a forensic interview for her later that day.

Portillo was subsequentially arrested and, on April 17, 2023, was charged with three counts of first degree sexual assault of a child and three counts of incest. The first two counts alleged that between January 12, 2018, and January 12, 2019, Portillo committed first degree sexual assault of a child who was younger than 12 years old and incest with a stepchild who was younger than 19 years old. The next two counts alleged the same crimes, but during the period between January 12, 2019, and January 12, 2022. The last two counts alleged that between January 12, 2022, and March 27, 2023, Portillo committed first degree sexual assault of a child who was at least 12 years old, but less than 16, and incest with a stepchild who was younger than 19 years old.

## 1. Pretrial Proceedings

On February 12, 2024, Portillo filed a motion to produce evidence of A.H.'s therapy records. The court conducted an in camera review and determined that Portillo was only entitled to the records regarding A.H.'s diagnoses and medications. With this determination, the court denied Portillo access to any remaining records that did not involve those topics.

On February 19, 2024, the State filed a motion in limine concerning an incident where Portillo allegedly acted inappropriately with A.H. and one of her friends, A.C., while they were playing pool in his basement. The State alleged that on this occasion, A.H. and A.C. were around 10 years old when Portillo touched them inappropriately under the guise of teaching them how to play pool. This touching allegedly involved Portillo putting his hands on their waists, bending them over the pool table, and pulling them close as he leaned over them. The motion next claimed that after the pool game, Portillo initiated a game of truth or dare, where he turned off

the lights and "dared" the girls to touch his body wherever they wanted. After this, he allegedly "dared" them to touch his privates, which both girls did.

The State argued that evidence of this misconduct should be admissible because it was inextricably intertwined with the charged crimes or, in the alternative, was admissible under Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2024) as proof of Portillo's motive, opportunity, intent, or plan. After considering the adduced evidence and the parties' arguments, the court granted the State's motion. In its order, the court found that the evidence was "clear and convincing" and "necessary to present a coherent picture of the relationship between the parties and the subsequent alleged sexual assaults."

## 2. Trial

A trial was held from March 25 to 29, 2024. The State called nine witnesses, and Portillo called three.

The State's first two witnesses were Officers Richard Martier of the Omaha Police Department and Lucas Brown of the Ralston Police Department. Martier was the first officer to respond after law enforcement was contacted on March 26, 2023. He testified that he spoke with A.H., who told him that her stepfather had sexually abused her. However, after learning that the abuse occurred in Ralston, Nebraska, Martier requested an officer from that jurisdiction. This prompted Brown's arrival and conversation with A.H., who again alleged that Portillo had sexually abused her.

Later that day, Portillo's case was assigned to Det. Luke Batterman of the Ralston Police Department. He testified that once he received Brown's report, he scheduled an interview for A.H. at Project Harmony, which is a child advocacy center that helps children and families who have experienced abuse or neglect. He then initiated the proceedings to immediately remove A.H. and her half sister, K.P., from the family home. Following this, Batterman secured and executed a search warrant for Portillo's house, retrieved two towels and two

bottles of lotion that A.H. mentioned in her forensic inter-
view, and arrested Portillo. Batterman stated that he did not
give Portillo any indication as to who the complaining victim
was before arresting him. However, when Portillo was told
that he was being arrested for the sexual assault of a child, he
asked, "'My daughter?'"

Batterman also interviewed Portillo at the police station.
During this interview, Portillo generally denied all of A.H.'s
accusations of sexual abuse. Batterman then discussed sending
the towels he retrieved from Portillo's home to the Nebraska
State Patrol Crime Laboratory so they could be tested for
Portillo's semen or DNA. However, these tests did not find
any male DNA on the towels.

Janessa Michaelis works as a forensic interviewer for
Project Harmony. She conducted four forensic interviews
related to this case. She interviewed A.H.; her half sister,
K.P.; and her friends A.C. and E.C. While Michaelis did not
discuss the substance of these interviews, she discussed com-
monalities present when children disclose sexual abuse. She
explained that it is more common for children to delay dis-
closures of sexual abuse for months or even years, rather than
to immediately report the conduct. Michaelis said this delay
can be caused because children do not realize they were being
abused or they do not want to get their abuser in trouble. She
said that this is particularly common when children are close
to their abuser because they can develop conflicting feelings
about reporting someone they love. She described how this
can make children who want the abuse to stop to not report
their abuser because they do not want that person removed
from their life. Children can also worry about other people's
reactions to the information and other family dynamics such
as loss of housing, financial support, and emotional support.
Michaelis explained that these feelings can further delay the
disclosure because children will weigh the pros and cons of
reporting the abuse.

Michaelis also explained that it is common for children to not disclose all the details of their abuse right away. She stated that disclosures often happen in "bits and pieces over an extended amount of time." And if the abuse occurred multiple times over a lengthy period, children often blend different incidents together. This makes it difficult for children to remember specific details from each incident because they are blurring similar episodes of abuse together. She also stated that it is rare for children to recall when exactly their abuse occurred because they do not track time in the same way as adults.

Jessica Tippery is a nurse practitioner who works for Project Harmony. She performed a medical examination on A.H. after her forensic interview. Prior to the examination, Tippery reviewed Michaelis' report and was aware that A.H. had accused Portillo of sexual abuse. After being asked why she came in, A.H. told Tippery that Portillo "'touches [her]'" when he gets drunk. She spoke about a particular instance when she was sleeping and Portillo anally, and possibly vaginally, penetrated her with his penis. A.H. told Tippery that he put lotion on his penis beforehand and that "'[d]ischarge'" came out of his penis afterward.

Tippery and A.H. also discussed various other incidents when Portillo touched A.H.'s breasts and "butt" over her clothes, touched the inside and outside of her vagina with his hands, and put his penis in her mouth. A.H. stated that such incidents occurred multiple times and that Portillo had been abusing her since she was 8 years old. She told Tippery that the last time Portillo touched her inappropriately was around 2 or 3 weeks earlier. Tippery then asked A.H. if anyone had ever offered her money in exchange for sexual favors, and A.H. said that Portillo once offered her $100 for sex, but she declined.

After A.H. made these disclosures, Tippery conducted a genital examination of A.H. to look for physical signs of abuse. She explained that A.H.'s examination was normal, in

that there were no signs of injury around A.H.'s vagina or anus. However, she clarified that she did not expect to see any physical injury to these areas because the skin in those regions heals quickly and A.H. alleged that the abuse had not occurred in several weeks.

A.H.'s testimony began with her providing a timeline of what house she lived in each year from 2017 to 2024, what school she went to each year, what grade she was in, and how old she was during each school year. With this information, she reported that she had lived in the same Ralston home from at least third grade to seventh grade, when she was 9 to 13 years old. She said that throughout this time, Portillo had the same job where he worked every day, including most weekends, from 4 or 5 a.m. until 6 or 7 p.m. However, she explained that he would often come home for lunch and watch her when her mother went to the store or out with friends.

The first time that A.H. remembered Portillo abusing her was when he woke her up in the middle of the night while she and K.P. slept in the same bed. When she woke up, she saw Portillo standing over her and felt his penis anally penetrate her. A.H. testified that her pants were on when she went to bed but had been removed while she slept. She did not remember much else about the incident and believed she fell asleep after seeing what was happening. The next day, she noticed her underwear was wet with a clear liquid.

A.H. then described another occasion when Portillo woke her up in the middle of the night and took her to his office, which was down the hall from her bedroom. She stated that once they were in the office, he pulled his pants down and put his penis in her mouth. She remembered "sucking" on his penis and how it went "back and forth" in her mouth. She did not remember how old she was when this happened but said that it was not the first time he had put his penis in her mouth. She later recalled that when the abuse first started, Portillo showed her pornographic videos of women performing oral sex so that she knew what to do.

Another time Portillo made A.H. perform oral sex on him while they were lying on the couch. She testified that her mother and K.P. were getting groceries at the time. Throughout this ordeal, A.H. stated that Portillo kept pushing her head down with his hands. She also explained that she was made to perform oral sex on Portillo when they showered together. She said that on multiple occasions, Portillo got home from work while her mother was making dinner and asked her to shower with him. A.H. remembered that he would wash both their bodies, have her kneel, and then put his penis in her mouth. And although it was not clear whether it happened during each incident, A.H. indicated that Portillo ejaculated in her mouth on several occasions.

A.H. also described an incident when Portillo asked her to give him a massage in his room. But after entering the room, Portillo locked the door, pulled his pants down, and told her to take her clothes off. He then had her perform oral sex on him and get on the bed. Once she was on the bed, he rubbed the tip of his penis on her vagina. Other times, Portillo brought A.H. into his room, put her on the bed, and anally penetrated her with his penis. While A.H. did not specify how often this sort of abuse occurred, it was regular enough that when he told her to go to his room, she knew what was going to happen.

A.H. also discussed various other times when Portillo touched her or acted inappropriately. She described how Portillo started touching her breasts when she began puberty. She said that one time, he pretended to trip in the hallway and put both his hands on her breasts while he fell. Other times while Portillo wrestled with her and K.P., he used his fingers to rub her vagina over her clothes. A.H. also recalled an occasion when he offered her $100 to show him her body, which she declined.

A.H. could not recall the exact timeline of her abuse but stated that these incidents occurred approximately every 2 to 3 weeks from when she was 8 years old and in third grade until she was 13 years old and in seventh grade. However,

upon more direct questioning, A.H. stated that the abuse began with Portillo making her perform oral sex on him. She said that it was not until she was 10 years old and in fourth grade that Portillo started anally penetrating her and touching her breasts. A.H. did not remember if he continued abusing her when she was in fifth grade and sixth grade but believed that he stopped when she was in seventh grade when she was around 12 or 13 years old. She said that Portillo often told her not to tell anyone about their activities because he could "'get in big trouble'" if anyone found out.

A.H. also described Portillo's playing pool and truth or dare with her and A.C. when they were around 10 years old. She described how Portillo tried teaching A.C. how to play pool and how he bent her over the table, leaned over her, and pushed his body up against hers. A.H. testified that A.C. later told her that Portillo rubbed his hand against the front of her pants while she was bent over the table. And then after they played pool, A.H. said that Portillo initiated a game of "'Truth or Dare with lights off.'" During this game, Portillo dared the girls to touch him anywhere while gesturing toward his chest and penis. A.H. said that she and A.C. only touched his chest and arms because she did not want to touch his private area. When asked whether she thought Portillo wanted them to touch his penis, A.H. responded affirmatively. This interaction seemingly made A.C. uncomfortable so she went upstairs and later refused to go to A.H.'s house if Portillo was there.

A.H. stated that she reported Portillo's abuse of her when she was 13 years old after he picked her up in the hallway and "touched her butt." Because she was afraid that he might start abusing her again, she revealed the abuse to her grandmother's son, who told her to tell her mother. Later that day, she told her mother but did not think she believed her. A.H. was worried that her mother was not going to do anything, so later that night, A.H. told her friend's mother, who reported the abuse to the police.

On cross-examination, Portillo's attorney questioned A.H. about inconsistencies in her allegations. A.H. admitted to lying initially to the police when she told them that Portillo had sexually assaulted her 40 to 50 times. She then went back and forth about whether her mother was home or running errands when Portillo abused her. Her original testimony was that her mother was sometimes home when it occurred, but at one point during cross-examination, she stated that her mother was always gone when Portillo abused her. Portillo's attorney also asked A.H. why she waited so long to report the abuse when there were several adults that she trusted who lived with them over the years. A.H. essentially said that she still loved Portillo at that point and did not want to see him removed from her life.

The next witness was A.V., one of A.H.'s friends who has known her for around 10 years. A.V. was with A.H. on March 25, 2023, when she reported the abuse to the mother of one of their friends. While her testimony mostly encompassed the events of that night and the following day when A.H. did her forensic interview, A.V. testified that A.H. had previously told her that Portillo was doing "'weird things'" to her. A.V. did not say when A.H. told her this but said that A.H. did not provide any further details and asked her not to tell anyone. After Portillo was arrested, A.H. stayed with A.V.'s family for the next 9 months. During this time, A.V. said that A.H. never recanted her accusations although they spoke about the abuse at least twice.

K.P., A.H.'s half sister, also testified. K.P. is 2 years younger than A.H. and is Portillo's biological daughter. She indicated that she slept with A.H. almost every night growing up because she was afraid of sleeping alone. She also spoke about how she and A.H. would give Portillo massages, rub lotion on his body, and walk on his back. When asked if she remembered Portillo ever taking A.H. to his room alone, K.P. remembered one time that occurred, but said the door remained open and indicated that she could see them almost the entire time. K.P.

testified that A.H. was rarely alone with Portillo because whenever K.P. went anywhere with her mother, A.H. always went as well.

On cross-examination, K.P. stated that it was rare for her and A.H. to be alone with Portillo because they usually went to their daycare when their mother was away. Because the daycare was at their friend's house, she stated that even when their mother went out at night or away for work, they were usually dropped off at the daycare. K.P. indicated they usually went to the daycare because Portillo worked late almost every day.

A.C. then testified and talked about the incident when Portillo was teaching her how to play pool when she was in fifth or sixth grade. She remembered that Portillo had consumed three or four shots of whiskey while they were playing. A.C. stated that when Portillo taught her how to play, he grabbed her waist, bent her over the table, and stood behind her with his leg pressed up against her. She said that he repeated this behavior around three times and that it made her feel uncomfortable. A.C. did not think Portillo touched her private areas but stated that she told A.H. that he did after it happened.

A.C. next described how Portillo initiated a game of truth or dare after the pool game. She said that when it was his turn, he told them that they could touch him wherever they wanted while the lights were off. A.C. said they only touched his arms, but when it was Portillo's turn again, he told them they could touch him wherever they wanted for longer this time. Because A.C. did not want to touch Portillo, she feigned the need to go to the bathroom and went upstairs. A.C. also testified about how Portillo often told her and her sister that A.H.'s other friends were his girlfriends "'since you don't want to be.'" Following these events, A.C. said that she did not feel comfortable going to A.H.'s house if Portillo was going to be there.

Jessica Womach is a mental health therapist who has worked with A.H. since June 2023. She explained that A.H. was diagnosed with post-traumatic stress disorder, unspecified, and has had numerous symptoms related to her diagnosis. These symptoms include negative beliefs, negative cognitions, physiological and psychological reactions to traumatic memories, a displayed inability to present with positive emotions, and an often-demonstrated negative emotional state that is directly related to fear, blame, and shame.

Womach explained that A.H. has conflicting feelings about her relationship with Portillo because she used to have a positive relationship with him and was confused as to why he abused her. She said that A.H. exhibits many trauma responses as a result of her abuse and feels a lot of shame because of it. This was illustrated during one of their sessions when Womach showed A.H. a picture of Portillo's bathroom. After seeing the photograph, A.H. became emotionally dysregulated, closed her eyes, and told Womach that she "could no longer do this."

Womach stated that A.H. disclosed details of her abuse to her only twice. During one of these conversations, A.H. told her about an event where she was lying in her bed with a pillow between her legs while Portillo abused her. A.H. told Womach that she did not understand what was going on and felt confused. She also said that she distracted herself with her phone during this incident. The other time A.H. disclosed details of her abuse to Womach was when she discussed the pool game. Womach said that A.H. did not think Portillo would target one of her friends so she felt safe as long as A.C. was with her. However, once A.C. left to go upstairs, A.H. became nervous because she did not want anything to happen to her or her friend.

A.H. told Womach that she decided to report Portillo's abuse after he picked her up in a hallway and "touched her butt." But after reporting the abuse to her mother, she saw her mother kiss Portillo the next day. This made A.H. believe that her

mother was not going to do anything so she felt the need to tell someone else.

After Womach testified, the court held a sidebar with the parties' counsels. In this sidebar, the following conversation occurred:

THE COURT: This might not be the best time for me to bring this up, but I wasn't expecting . . . Womach's testimony to be so detailed, because the reason I didn't give any — the notes out is because she didn't mention anything about this incident at all in those therapy notes. As of the 29th of February, she hadn't narrated anything.

So I think — so that might be relevant for his cross-examination, but after-the-fact. So I don't know how you want to handle this. But if you can bring her back here tomorrow, you can reopen your cross. I'll give you all the documents and you can look at them. But I don't know how else to fix that.

Any ideas?

[Portillo's attorney:] Well, I have one, but I'd move for a mistrial, obviously.

THE COURT: You can move for one, but if I let them bring her back and reopen your cross, I think that fixes your problem.

[Portillo's attorney:] How many documents are there?

THE COURT: Pardon me?

[PORTILLO'S ATTORNEY:] The documents, how many are there? Ten pages, two pages?

THE COURT: 12 or 15.

[Portillo's attorney:] I can get through that.

[State:] I feel that's a more appropriate remedy than a mistrial.

THE COURT: I'm not going to grant your mistrial at this point. Think you can get her back here tomorrow?

[State:] She's under subpoena with the Court's order.

[Portillo's attorney:] You have those, right?

THE COURT: Yeah, I can bring them. I looked at them again to make sure —

[State:] Maybe we can figure out an exact time.

[Portillo's attorney:] We'll figure it out.

. . . .

[State:] Could we just re-call . . . Womach and go into his cross-examination as an examination basically?

THE COURT: If she can get back here in an hour or so, we can give it a try, maybe.

[State:] I don't know if she has patients this afternoon or appointments.

THE COURT: I don't know. I think we'll break for the day and then you can take a look at the records. You can take a look at the records.

[Portillo's attorney:] That's probably cleaner.

THE COURT: Have her be back here at 9:00 in the morning.

[State:] Okay.

The next morning, Womach was recalled and cross-examined on her therapy records. Within these records was a note that A.H. had told Womach, "'I want to tell you something, but I don't want you to tell the Court.'" Portillo's attorney asked Womach if this was an attempt by A.H. to recant her accusations, but Womach said she could not offer an opinion on that. Womach testified that after A.H. told her that, she had a discussion with her about confidentiality, and that A.H. ended up not disclosing anything to her at that time.

Portillo then called his three witnesses. His first witness was Roxanna Perna. Perna has known A.H.'s family for 6 years, works with A.H.'s mother, and has stayed at their house many times. She said that she was close with A.H., watched her and K.P. when their parents went out of town, and believed that A.H. trusted her. She said that throughout the time she spent with A.H., A.H. never reported any misconduct by Portillo. She then expressed her belief that A.H. was manipulative and described how she overreacts when

something does not go her way. She explained that A.H. would lie about small things and believed that it was hard for her to tell the truth.

Dayanaa Villegas-Pena was Portillo's next witness and testified through an interpreter. Villegas-Pena has known A.H.'s family for 7 years, lived with them from March 2018 until April 2019, and watched A.H. and K.P. when their parents went on a 10-day vacation to Hawaii. She said that she never saw Portillo alone with A.H. or K.P. because he was either working, he was going out with friends, or someone else was at the house with A.H. and K.P. Villegas-Pena also mentioned that A.H. adored Portillo and that she believed that A.H. and Portillo had a good relationship. She then described A.H. as manipulative and calculating when she wants something and expressed her belief that A.H. does not tell the truth.

E.C., A.C.'s older sister, testified next. She testified that she did not spend a lot of time around Portillo and rarely saw him interact with A.H. but thought they had a normal father-daughter relationship. She said that she routinely spent the night at A.H.'s house but never saw Portillo doing anything inappropriate. On cross-examination, E.C. said that Portillo made her feel uncomfortable multiple times when she was 11 or 12 years old by calling her his girlfriend. Another time, when she was around the same age, they were swimming in Portillo's pool when he told A.C., "'I like your boobs.'" She also said that there were times when she went over to A.H.'s house and Portillo was the only adult there. On one of these occasions, she, A.H., and A.C. were playing outside when they looked in a window and saw Portillo masturbating in the living room while watching television.

### 3. Verdicts and Sentencing

After deliberating, the jury found Portillo guilty of two counts of first degree sexual assault of a child and two counts of incest. The jury also found him not guilty of one count of first degree sexual assault of a child and one count of

incest. Notably, he was found not guilty of the sexual assault and incest charges that alleged the conduct occurred between January 12, 2022, and March 27, 2023, and that Portillo sexually penetrated A.H. when she was at least 12 years old, but less than 16 years old.

The court convicted Portillo on the two sexual assault and two incest charges. The court ultimately sentenced Portillo to 20 to 30 years' imprisonment for each of the sexual assault convictions and 10 to 15 years' imprisonment for each of the incest convictions. The court ordered these sentences to run concurrently and gave Portillo 437 days' credit for time served.

Portillo now appeals with different counsel.

### III. ASSIGNMENTS OF ERROR

Portillo assigns, restated and reordered, that the district court erred by (1) granting the State's motion in limine, (2) failing to release all of A.H.'s therapy records prior to trial, (3) advising and allowing the State to recall Womach as a witness, and (4) denying his motion for a mistrial. Portillo also assigns that (5) the evidence was insufficient for a rational trier of fact to find that the State proved the elements of the charged crimes beyond a reasonable doubt.

Portillo additionally assigns that he received ineffective assistance of trial counsel because his trial counsel failed to (6) object to testimony regarding the pool game, (7) introduce A.H.'s forensic interview into evidence, (8) impeach A.H. based on her prior inconsistent statements made to Tippery during her medical examination, (9) impeach A.H. based on her prior inconsistent statements made during her deposition, (10) motion for a new trial based on prosecutorial misconduct, (11) call him to testify in his own defense, and investigate and call as witnesses (12) A.H.'s mother, (13) Francisco Hernandez, (14) Yanira Hernandez, (15) Julio Cardona, and (16) Carlos Velasquez. Lastly, Portillo assigns that (17) the cumulative errors of his trial counsel prejudiced his case and did not meet the standards for effective representation.

## IV. STANDARD OF REVIEW

[1,2] A district court's decision to permit a party to recall a witness is reviewed for an abuse of discretion. See *State v. Williams*, 306 Neb. 261, 945 N.W.2d 124 (2020). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Laflin*, 23 Neb. App. 839, 875 N.W.2d 919 (2016).

[3] An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the trial court has abused its discretion. *State v. Lenhart*, 317 Neb. 787, 11 N.W.3d 661 (2024).

[4] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. *State v. Clark*, 315 Neb. 736, 1 N.W.3d 487 (2024). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

[5,6] Whether a claim of ineffective assistance of counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Npimnee*, 316 Neb. 1, 2 N.W.3d 620 (2024). In reviewing a claim of ineffective assistance of counsel on direct appeal, an appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. MOTION IN LIMINE

Portillo first assigns that the district court abused its discretion by granting the State's motion in limine concerning the pool game in his basement. At trial, A.H., A.C., and Womach testified about the pool game to varying degrees.

[7,8] We determine that Portillo waived any objection he had to evidence of the pool game because he failed to object when A.H., A.C., and Womach testified about the event at trial. A motion in limine is a procedural step to prevent prejudicial evidence from reaching the jury. *State v. Monterroso*, 33 Neb. App. 147, 12 N.W.3d 282 (2024). It is not the office of a motion in limine to obtain a final ruling upon the ultimate admissibility of the evidence. *Id.* Therefore, when a court overrules a motion in limine to exclude evidence, the movant must object when the particular evidence is offered at trial in order to predicate error before an appellate court. *Id.* If, when inadmissible evidence is offered, the party against whom such evidence is offered consents to its introduction, or fails to object or to insist upon a ruling on an objection to the introduction of the evidence, and otherwise fails to raise the question as to its admissibility, the party is considered to have waived whatever objection he or she may have had thereto, and the evidence is in the record for consideration the same as other evidence. *Arroyo v. Caring for People Servs.*, 29 Neb. App. 93, 952 N.W.2d 11 (2020). Because Portillo did not object when A.H., A.C., and Womach testified about Portillo's behavior during the pool game, we determine that he has waived any objection to the admission of that evidence.

### 2. THERAPY RECORDS

Portillo next assigns that the district court abused its discretion by failing to release all of A.H.'s therapy records before trial. Although the records were eventually released before Womach was recalled as a witness, Portillo argues the delay in disclosing them irreparably damaged his ability to present

a defense. More specifically, he points to the record containing A.H.'s comment to Womach where she said, "'I want to tell you something, but I don't want you to tell the Court.'" Portillo asserts that this comment displays an attempt by A.H. to recant her accusations against him. He argues that if he had A.H.'s therapy records prior to trial, he could have used that statement to more effectively cross-examine her and attack her credibility.

[9] The Nebraska Supreme Court set forth the procedure for obtaining privileged medical records in *State v. Trammell*, 231 Neb. 137, 435 N.W.2d 197 (1989). In that case, the court stated:

> "[If] the claimed impeaching information is privileged there must be a showing that there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken. Upon such a showing the court may then afford the state an opportunity to secure the consent of the witness for the court to conduct an in camera inspection of the claimed information and, if necessary, to turn over to the defendant any relevant material for the purposes of cross-examination. If the defendant does make such showing and such consent is not forthcoming then the court may be obliged to strike the testimony of the witness. . . . If the in camera inspection does reveal relevant material then the witness should be given an opportunity to decide whether to consent to release of such material to the defendant or to face having her testimony stricken in the event of refusal."

*Id.* at 142-43, 435 N.W.2d at 201.

Within his argument, Portillo asserts that this procedure was not properly followed by the district court. However, regardless of whether the procedure was followed, the therapy records at issue are not part of the appellate record before us. In fact, not even the portion of the records concerning A.H.'s

diagnoses and medications that were disclosed to Portillo prior to trial appear in the record. The procedure set forth in *State v. Trammell, supra*, does not address, and therefore does not prevent, a defendant's request that the records reviewed be sealed and included as part of an appellate record. *State v. Berger*, 31 Neb. App. 379, 980 N.W.2d 634 (2022). And in fact, such action is anticipated by the Connecticut Supreme Court case from which the *Trammell* procedure was derived. See, *State v. Esposito*, 192 Conn. 166, 471 A.2d 949 (1984); *State v. Berger, supra.*

[10] Without the therapy records before us, we are unable to review whether the district court abused its discretion by not releasing all of A.H.'s therapy records prior to trial. It is incumbent upon an appellant to supply a record which supports his or her appeal. *State v. Berger, supra*. Absent such a record, as a general rule, the decision of the lower court is to be affirmed. *Id.* Because the therapy records are not in the record, we are unable to analyze whether the information contained within them was likely to impair Portillo's right of confrontation if not released. Accordingly, we must affirm the district court's decision to not release the records prior to trial.

[11] To the extent that Portillo argues that his not knowing about A.H.'s comment to Womach, standing alone, irreparably prejudiced his defense and violated his right of confrontation, we disagree. As the Supreme Court has stated, "[W]e will not presume prejudice based on mere speculation." *State v. Sandoval*, 280 Neb. 309, 324, 788 N.W.2d 172, 194 (2010). A.H.'s comment that she wanted to tell Womach something but did not want her to tell the court is too ambiguous to derive any clear meaning. And as Womach testified, A.H. never revealed what she intended to say after being informed of the rules regarding confidentiality. It is impossible to know what A.H. wanted to tell Womach and how she would have responded to being cross-examined with this statement. Therefore, Portillo's assertion that this was an attempt by

A.H. to recant her accusations is nothing more than speculation. Because there was no record to review for this assignment and Portillo was not able to demonstrate prejudice beyond mere speculation, we determine this assignment of error fails.

### 3. Recalling Womach as Witness

Portillo next assigns that the district court abused its discretion by advising and allowing the State to recall Womach as a witness. He essentially asserts that because recalling Womach was the district court's idea, it violated its role as a neutral fact finder.

[12,13] In *State v. Williams*, 306 Neb. 261, 945 N.W.2d 124 (2020), the Supreme Court, for the first time, determined that the applicable standard for when a trial court permits a party to recall a witness prior to resting its case is to review for an abuse of discretion. In deciding this, the Supreme Court cited to the following proposition:

> It is not an abuse of discretion to permit the State to recall a witness for the purpose of filling in gaps in proof or to introduce an exhibit that the party had inadvertently failed to offer, as long as the court does not advocate for or advise the State to do so.

*Id.* at 270, 945 N.W.2d at 133. Portillo now cites this proposition to support his argument that the district court violated its role as a neutral fact finder by advocating for the recall of Womach.

While the district court brought forth the idea of recalling Womach, it did not do so for the purpose of filling in gaps in proof that the State inadvertently failed to offer. Instead, the court suggested Womach's recall in an attempt to cure any prejudice created by its initial refusal to release all of A.H.'s therapy records. Because this posture is distinct from other cases that have cited the same proposition of law, we determine the proposition from *State v. Williams, supra*, that prohibits trial courts from advocating for or advising the State to

recall a witness, is inapplicable to the current matter. See, *State v. Bol*, 288 Neb. 144, 846 N.W.2d 241 (2014) (finding trial court did not abuse its discretion because State initiated discussion regarding insufficiency of evidence to prove element of offense); *State v. Laflin*, 23 Neb. App. 839, 875 N.W.2d 919 (2016) (finding trial court abused its discretion by informing State it had not yet proved venue).

Additionally, we note that the district court initially informed the parties that it was unsure how they wanted to proceed before suggesting that Womach could be brought back the next day so Portillo's attorney could reopen his cross-examination. Following that, the court and parties held a discussion whereupon the State eventually suggested that it could recall Womach and have Portillo's attorney "go into his cross-examination." With this, we cannot say that the district court's decision to introduce the idea of recalling Womach was untenable or unreasonable. It only did so to cure any potential prejudice after her testimony went beyond what the court believed was in her therapy notes. Because of this, we determine the district court did not abuse its discretion by suggesting the idea and allowing the State to recall Womach as a witness.

[14,15] However, even if this was not the case, we note that Portillo failed to object to the remedy offered by the district court. The failure to make a timely objection waives the right to assert prejudicial error on appeal. *State v. Schreiner*, 276 Neb. 393, 754 N.W.2d 742 (2008). One cannot know of purportedly improper judicial conduct, gamble on a favorable result as to that conduct, and then complain that he or she guessed wrong and does not like the outcome. *Id.* While Portillo motioned for a mistrial after the court informed him of the situation, once that motion was denied, Portillo failed to object to the court's proposed and ultimate solution. As such, even if he was prejudiced by the court's suggesting and permitting Womach to be recalled as a witness, he failed to preserve the issue for appeal.

### 4. Motion for Mistrial

Portillo next assigns the district court abused its discretion by not granting his motion for mistrial. He asserts that he suffered actual prejudice when he was denied the ability to review A.H.'s therapy records prior to trial. He also argues that the district court failed to cure that prejudice when it released the records after Womach's initial testimony.

[16-18] A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Lenhart*, 317 Neb. 787, 11 N.W.3d 661 (2024). In order to prove error predicated on the failure to grant a mistrial, the defendant must prove the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. *Id.* In the context of a denial of a motion for mistrial, actual prejudice means prejudice that is "'"[e]xisting in fact; real."'" *Id.* at 794, 11 N.W.3d at 667. In defining the term, the Supreme Court has drawn on its meaning in similar legal contexts to determine that actual prejudice requires "'a reasonable probability that, but for [the] errors, the result of the proceeding[s] would have been different.'" *Id.* at 794, 11 N.W.3d at 667. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

The only prejudice Portillo claims to have suffered from not having A.H.'s therapy records prior to the trial relates to his inability to properly prepare for the trial. However, this does not amount to actual prejudice because Portillo fails to identify what information within the records would have altered the outcome of the proceedings had he obtained it before trial. More so, he fails to demonstrate how this potential prejudice survived the court's remedy of releasing the records prior to the State's recalling Womach to be recross-examined. While Portillo argues that the "prejudice was not ameliorated in the slightest" when he received the records because "at that point, A.H. had already testified and been subject to

cross[-]examination," he still fails to specifically identify what information, if discovered prior to trial, would have changed the outcome of the proceeding. Brief for appellant at 34. Without Portillo's citing to any specific information within the records and without the therapy records before us, we cannot say that Portillo was actually prejudiced or deprived of a fair trial when he was denied the ability to review A.H.'s therapy records prior to trial. Therefore, we determine the district court did not abuse its discretion by denying his motion for mistrial.

## 5. Sufficiency of Evidence

In Portillo's next assignment, he asserts that a rational trier of fact could not have found him guilty of first degree sexual assault of a child and incest beyond a reasonable doubt because there was insufficient evidence to prove he sexually penetrated A.H. within the alleged timeframes.

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. *State v. Clark*, 315 Neb. 736, 1 N.W.3d 487 (2024). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

As it applies in the present case, a person commits first degree sexual assault of a child when he or she subjects another person under 12 years of age to sexual penetration and the actor is at least 19 years of age or older. See Neb. Rev. Stat. § 28-319.01(1)(a) (Reissue 2016). "Sexual penetration" includes "any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical,

nonhealth, or nonlaw enforcement purposes." See Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2024). And, as it applies in the present case, incest is committed when any person knowingly engages in sexual penetration with his or her stepchild who is under 19 years of age. See Neb. Rev. Stat. § 28-703(1) (Reissue 2016).

We note that Portillo's argument is limited to arguing that a rational trier of fact could not have found beyond a reasonable doubt that A.H. was sexually penetrated by Portillo between January 12, 2018, through January 12, 2022. He essentially asserts a fact finder could not have determined these elements were met because A.H.'s story was "patently unbelievable," inconsistent, vague, and lacked any mention of pain, although she alleged to have been anally penetrated multiple times. Brief for appellant at 35. He also asserts that A.H.'s timeline of events was similarly inconsistent and contradictory.

[19] In citing to the inconsistencies in A.H.'s accusations, Portillo is essentially asking for us to reweigh evidence and render judgment as to A.H.'s credibility. While we acknowledge that A.H.'s story is not entirely consistent and that she contradicted herself multiple times throughout her testimony, the issues of credibility and how to weigh conflicting evidence were matters for the jury to decide. See *State v. Clark, supra.* As such, we refuse to relitigate those issues. Instead, as mentioned, our review solely focuses on whether there was sufficient evidence adduced, when viewed in the light most favorable to the prosecution, for any rational trier of fact to find that the essential elements of the crimes were proved beyond a reasonable doubt.

After conducting that review, we determine there was sufficient evidence for the jury to find that Portillo penetrated A.H. multiple times between January 12, 2018, and January 12, 2022. A.H. testified that she was born in 2010 and that Portillo started orally penetrating her when she was 8 or 9 years old. This means that the abuse began sometime around 2018 or 2019. This also aligns with A.H.'s testimony that

the abuse only occurred in her parents' Ralston home, where she lived from at least 2019 to 2024. Further, according to A.H.'s testimony, Portillo began to anally penetrate her when she turned 10 years old, which occurred in 2020. More so, A.H. testified that Portillo continued to orally, anally, and sometimes vaginally penetrate her every 2 or 3 weeks until she turned 13 years old, which happened in 2023. Therefore, when viewed in the light most favorable to the prosecution, there was sufficient evidence for the jury to find that A.H. was sexually penetrated regularly from 2018 or 2019 until sometime around 2023. Because of this, we determine there was sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that Portillo sexually penetrated A.H. multiple times between January 12, 2018, and January 12, 2022.

### 6. Ineffective Assistance of Trial Counsel

Portillo lastly assigns 12 claims of ineffective assistance of trial counsel. Within these claims, Portillo asserts that his trial counsel was ineffective because he failed to (1) object to testimony regarding the pool game, (2) introduce A.H.'s forensic interview into evidence, (3) impeach A.H. based on her statements made to Tippery during her medical examination, (4) impeach A.H. based on her statements made during her deposition, (5) motion for a new trial based on prosecutorial misconduct, (6) call him to testify in his own defense, and investigate and call as witnesses (7) A.H.'s mother, (8) Francisco, (9) Yanira, (10) Cardona, and (11) Velasquez. Lastly, he assigns these cumulative errors prejudiced his case and did not meet the standards for effective representation. The State contends the record is insufficient to address all but one of these claims on direct appeal.

[20-22] When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from

the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Clark*, 315 Neb. 736, 1 N.W.3d 487 (2024). However, the fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id.* The determining factor is whether the record is sufficient to adequately review the question under the standard of review. *Id.* The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id*.

[23-25] Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Clark, supra*. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id*. To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

(a) Failure to Object to Pool Game Testimony

Portillo's first claim of ineffective assistance asserts that his trial counsel was ineffective for failing to object to A.H.'s and A.C.'s testimonies concerning the pool game. He argues that he was prejudiced by this failure because the evidence was inadmissible under § 27-404(2) and resulted in him waiving the issue on appeal. We determine the record is sufficient to resolve this claim on direct appeal and that Portillo will be

unable to demonstrate that this alleged error prejudiced him. Even if his trial counsel had objected to A.H.'s and A.C.'s testimonies concerning the pool game, the result of the proceeding would not have been different because the objection would have been meritless.

[26-28] Under § 27-404(2), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. *State v. Mabior*, 314 Neb. 932, 994 N.W.2d 65 (2023). However, § 27-404(2) does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime. *State v. Mabior, supra.* Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime and evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts. *Id.* Evidence of other crimes or bad acts is also inextricably intertwined with the charged crime if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime. *Id.*

We determine the evidence concerning Portillo's conduct during the pool game was inextricably intertwined to the crimes Portillo was charged with committing. Portillo's theory at trial was that none of the alleged misconduct occurred and that A.H. was making up the accusations against him. Therefore, A.H.'s and A.C.'s having similar accounts of Portillo's behaving inappropriately during and after the pool game were necessary for the jury to have a coherent picture of his misconduct toward A.H. Because A.H.'s and A.C.'s testimonies were inextricably intertwined with the sexual assaults and thus did not constitute impermissible § 27-404(2) evidence, any objection to their testimonies on those grounds would have been meritless. As such, Portillo will not be able to demonstrate he was prejudiced by his trial counsel's failing to object to the evidence. Therefore, we determine this assignment of error fails.

### (b) Failure to Introduce A.H.'s Forensic
### Interview Into Evidence

Portillo next claims his trial counsel was ineffective because he failed to introduce A.H.'s forensic interview into evidence. He asserts that A.H.'s statements during this interview were inconsistent with her statements during her medical examination and her testimony at trial.

Because A.H.'s forensic interview is not in the record, we determine the record is insufficient to adequately review this claim on direct appeal, but it is preserved for purposes of postconviction review.

### (c) Failure to Impeach A.H. With Statements
### From Her Medical Examination

Portillo also claims his trial counsel was ineffective for failing to impeach A.H. with the statements she made to Tippery during her Project Harmony medical examination. Specifically, he points to her inconsistent statements regarding when the first anal penetration occurred, when the anal penetration ended, whether Portillo put lotion on his penis, whether Portillo discharged when he orally penetrated her, and whether she experienced pain when she was anally penetrated.

[29-32] Trial counsel's decisions that amount to reasonable trial strategy do not constitute deficient performance. *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021). Decisions about whether to engage in cross-examination, and, if so, to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim. *Id.* We do not use perfect hindsight to criticize unsuccessful trial strategies or second-guess trial strategy. *Id.* However, the Supreme Court has cautioned that "it is more the exception than the rule that defense counsel's strategy can be reasonably inferred from the trial record on direct appeal." *Id.* at 431, 966 N.W.2d at 855. Therefore, it has signaled that when the record is devoid as to why trial counsel chose not to ask specific questions, the record is often insufficient to address an ineffective

assistance claim on direct review. See *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021).

We determine that because the record is silent as to why Portillo's trial counsel failed to cross-examine A.H. with the allegedly inconsistent statements she made to Tippery, the record is insufficient to adequately review this claim on direct appeal, but it is preserved for purposes of postconviction review.

### (d) Failure to Impeach A.H.
### With Her Deposition

Portillo next claims his trial counsel was ineffective because he failed to impeach A.H. with the statements she made during her deposition. He asserts that A.H.'s deposition testimony differed from her trial testimony in multiple aspects. These differences include (1) what information she initially disclosed to A.V. and how she reacted, (2) whether Portillo ever performed oral sex on her, (3) how frequently she was anally penetrated and where it happened, (4) what time of day the abuse occurred, (5) who was in the home when the abuse occurred, (6) whether Portillo put lotion on his penis, (7) the frequency of the oral penetration, and (8) how often she was abused in the shower and when it occurred.

Because A.H.'s deposition is not in the record, we determine the record is insufficient to adequately review this claim on direct appeal, but it is preserved for purposes of postconviction review.

### (e) Failure to Motion for New Trial Based
### on Prosecutorial Misconduct

Portillo next claims that his trial counsel was ineffective because he failed to motion for a new trial based on prosecutorial misconduct. He asserts that A.H.'s mother was intimidated by the prosecutors a week before his trial and made to believe that she would be criminally charged if she testified in Portillo's defense.

There is nothing in the record concerning this incident between A.H.'s mother and the prosecutors. Therefore, we determine the record is insufficient to adequately review this claim on direct appeal, but it is preserved for purposes of postconviction review.

### (f) Failure to Have Portillo Testify
### in His Own Defense

Portillo also assigns his trial counsel was ineffective for failing to call him to testify in his own defense.

Although Portillo does not allege any facts to suggest that his counsel improperly advised him to not testify, we determine that the record is not sufficient to address this claim on direct appeal. See *State v. Balvin*, 18 Neb. App. 690, 791 N.W.2d 352 (2010). The record does not contain any communications between Portillo and his trial counsel concerning whether he should testify in his own defense or any indication of his counsel's reason for not calling him to testify. Therefore, we determine the record is insufficient to adequately review this claim on direct appeal, but it is preserved for purposes of postconviction review.

### (g) Failure to Investigate and
### Call Certain Witnesses

Portillo's next five ineffective assistance claims concern his trial counsel's failure to investigate and call five individuals as witnesses.

[33,34] When the claim of ineffective assistance on direct appeal involves uncalled witnesses, vague assertions that counsel was deficient for failing to call "witnesses" are little more than placeholders and do not sufficiently preserve the claim. *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022). However, the appellate court does not need specific factual allegations as to what the person or persons would have said, which will not be found in the appellate record. *Id.* It is sufficient that appellate counsel give on direct appeal the names or descriptions of any uncalled witnesses forming the basis

of a claim of ineffective assistance of trial counsel. *Id.* Such specificity is necessary so that the postconviction court may later identify whether a particular claim of failing to investigate a witness is the same one that was raised on direct appeal. *Id.*

Portillo's assignments of error and supporting arguments specified the name of five witnesses whom he claims would have supported his innocence, provided testimony of A.H.'s untruthfulness, or testified about his own credibility: (1) A.H.'s mother, (2) Francisco, (3) Yanira, (4) Cardona, and (5) Velasquez. Accordingly, Portillo sufficiently raised these claims of ineffective assistance. However, the record is silent as to what these uncalled witnesses would have testified to and whether they would have said what Portillo claims. Therefore, we determine the record is insufficient to adequately review these claims on direct appeal, but they are preserved for purposes of postconviction review.

### (h) Cumulative Errors of Trial Counsel

Lastly, Portillo assigns that the combined errors of his trial counsel prejudiced his case and did not meet the standards of effective representation.

Because the record was insufficient to adequately review most of Portillo's claims of ineffective assistance, the record is also inadequate to review this claim. Therefore, insofar as this claim relates to his other preserved ineffective assistance claims, we determine the record is insufficient to adequately review this claim on direct appeal, but it is preserved for purposes of postconviction review.

### VI. CONCLUSION

We determine Portillo waived any objections to the evidence concerning the pool game and affirm the district court's decision regarding the release of A.H.'s therapy records. We also determine the district court did not abuse its discretion in suggesting and permitting Womach to be recalled as a witness and by denying Portillo's motion for mistrial. Further, we determine there was sufficient evidence presented at trial

for the jury to find that Portillo was guilty of the crimes for which he was convicted.

We next determine Portillo will be unable to demonstrate he was prejudiced by his trial counsel's failing to object to A.H.'s and A.C.'s testimonies concerning the pool game. Lastly, we determine the record is insufficient to adequately review the remainder of Portillo's ineffective assistance claims, but they are preserved for purposes of postconviction review.

Affirmed.