IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF AUSTIN R.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AUSTIN R., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

AUSTIN R., APPELLANT.

Filed October 14, 2025.    No. A-25-076.

Appeal from the Separate Juvenile Court of Douglas County: MARY M.Z. STEVENS, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Emma J. Lindemeier for appellant.

Jackson Stokes, Deputy Douglas County Attorney, for appellee.

PIRTLE, BISHOP, and FREEMAN, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

Austin R. was adjudicated in the separate juvenile court of Douglas County as having committed first degree sexual assault. On appeal, he assigns that the juvenile court erred in not allowing him to cross-examine the State's witnesses, not allowing him to call witnesses in his defense, making certain evidentiary rulings, determining the State proved its case beyond a reasonable doubt, and denying his motion for mistrial. For the reasons that follow, we affirm.

## II. BACKGROUND

When Austin was 12 to 15 years old, from the summer of 2021 until March 2024, he lived on a week-on, week-off basis with his father, Brian R., and his father's then-girlfriend, Alexandria

H. Also present in the home during this time was Alexandria's daughter, A.M., who was born in September 2018.

On August 20, 2024, Austin was charged in juvenile court with one count of first degree sexual assault for allegedly sexually penetrating A.M. on or about February 15, 2023, without her consent. Prior to trial, the juvenile court ordered both parties to exchange final witness lists by November 12, 2024. However, Austin did not file his witness list until November 26. In this filing, he detailed his intent to call Elizabeth Valenzuela, Austin's mother; Patrice Clemons, a Nebraska Department of Health and Human Services (DHHS) employee; and Evaristo Valenzuela, whose relation to Austin is not clear.

An adjudication was held across several days in December 2024 and January 2025. The State called A.M., Alexandria, Danielle Cordle, and Jessica Tippery to testify.

A.M. testified first and said she was 6 years old. She identified Austin as her brother and discussed how she used to share a room in the basement with him, their parents, and other siblings when she was around 4 or 5 years old. She then described a time when Austin touched her "private part" with his mouth while they were playing in the basement. She said on this occasion, she was wearing clothes when Austin's mouth touched the area "next to [her] legs" that she uses "to go to the bathroom." However, when A.M. was later asked about Austin touching her vagina with his mouth, she stated that she "forgot that didn't happen."

Nevertheless, A.M. further testified that Austin told her that he would give her money and a sucker if she sucked his "boy private," which she identified as his penis. She said she was fully clothed when she performed oral sex on Austin and remembered that he was not wearing any underwear or shorts. She recalled that nothing came out of his penis during the incident, that it "tasted weird," and felt "disgusting." Although she was unable to remember when this occurred, she said it happened while she was in preschool. She testified that this only happened once because she told her mother about it afterward.

During cross-examination, Austin's attorney attempted to ask A.M. about a forensic interview she completed at Project Harmony. However, the court sustained the State's beyond the scope of direct examination objection. Austin's attorney also attempted to ask A.M. whether their sleeping arrangements at Brian's house changed after the incident, but the court again sustained the State's beyond the scope objection. The court then stated, "I think that line of questioning has gone sufficiently far, so should go no further." Austin's attorney then said she had no further questions.

Alexandria testified next. She described how A.M. and Austin were playing in the basement together one evening in February 2023. After they finished playing, Alexandria noticed that A.M. was unusually quiet and asked her if she was okay. A.M. then told her that Austin tried to put his penis in her vagina and made her perform oral sex on him. Right after A.M. told her this, Alexandria directed Brian to speak to Austin, gave A.M. a bath, and inspected her vagina for any signs of trauma.

Following A.M.'s disclosure, Alexandria prohibited Austin from staying with them for several months. Eventually, however, Austin expressed a desire to return. Before allowing that, Alexandria, Brian, A.M., and Austin sat down together to discuss the prior incident. Alexandria testified that at the meeting, A.M. recounted the sexual abuse and Austin admitted it was all true.

Alexandria later allowed Austin to live with them again but prohibited him from being around the children unsupervised.

The next year, in March 2024, Alexandria and A.M. moved out of Brian's home after she and Brian broke up. Then in April, Alexandria reported Austin's prior conduct to Child Protective Services (CPS). She explained that she waited so long because she had not known what to do. But after the mother of Brian's daughter told her not to allow Austin around A.M. and that she was filing a report against him with CPS, Alexandria also decided to make a report. While it was not clear why the other woman was filing a report against Austin, it seemed to involve an incident with Brian's daughter.

Cordle testified next. She works at Project Harmony as a forensic interviewer and interviewed A.M. in April 2024. During this interview, A.M. told Cordle that Austin made her lick his genitals in the basement of Brian's house. Additionally, A.M. told her that Austin bit her vagina and peed on her. When Cordle asked A.M. what Austin's penis looked and felt like, A.M. stated it was long and hard. She then attempted to show Cordle what Austin's penis looked like by stacking her fists on top of one another near her genital area.

Tippery testified next. She works at Project Harmony and is the nurse practitioner who completed A.M.'s medical exam in April 2024. Tippery stated that during the examination, A.M. was able to identify various body parts and referred to her vagina as her "private." When she asked A.M. about her accusations, A.M. recounted how Austin made her lick his privates. She recalled that Austin's pants were off when this happened and that pee came out of his penis. A.M. also informed Tippery that Austin had touched her vagina with his mouth. She then described how Austin pulled down her underwear and contacted her skin with his mouth. While A.M. alleged that Austin only touched her vagina with his mouth once, she claimed he made her perform oral sex multiple times. Because the alleged abuse occurred more than a year before her examination, Tippery was unable to refute or confirm the allegations.

Following Tippery's testimony, the State rested. Austin's attorney then informed the court that she intended to recall A.M. and Alexandria to testify in his defense and requested additional time to serve them with subpoenas. At this point, the State objected to all the defense's witnesses because they failed to file a witness list by the imposed deadline. The court then ruled that Austin would be unable to call Clemons and Evaristo as witnesses but took the matter under advisement as to whether he could call Elizabeth, A.M., and Alexandria. The court later issued an order determining that Austin would only be able to recall A.M. and Alexandria as witnesses in his defense.

Once A.M. was recalled as Austin's witness, she recounted how Austin told her to "suck hi[s] boy private" and that she completed a forensic interview at Project Harmony. However, she could not remember what she said during the interview. Austin's attorney then requested a continuance so that A.M. could watch the interview to refresh her recollection. After a brief discussion in chambers, the court denied the request.

Austin's attorney next attempted to refresh A.M.'s recollection with portions of her forensic interview. But when she tried to play the video, it was discovered that the disc was broken. Because the interview could only be downloaded pursuant to a court order, Austin's attorney requested a continuance so she could obtain an order and download the file. The court issued the order for A.M.'s April 2024 interview to be downloaded and continued the matter for a later date.

When the adjudication continued on January 3, 2025, Austin's attorney began by motioning for a mistrial. She argued that a mistrial was warranted because the cumulative effect of several issues resulted in unfair prejudice and violated Austin's rights to due process and confrontation. In particular, she cited her inability to adequately cross-examine A.M. when she was called by the State, her inability to call material witnesses to testify in Austin's defense, the broken disc of A.M.'s forensic interview, and the court previously referring to A.M. as "sweet girl." After the State objected, the court denied Austin's motion for mistrial.

The defense then continued its direct examination of A.M. A.M. testified that she remembered being recorded at Project Harmony and that reviewing the video would help her remember what she had said. She then watched a portion of the interview where she said that she "licked Austin's private." After being asked if there was a difference between licking and sucking, A.M. stated that although she said she "licked" Austin's private during the interview, she meant to say she "sucked" his private.

She was next asked whether anything came out of Austin's penis during the incident and whether she said anything to Austin while it happened. She testified that nothing came out of his penis and that she only told him she was going to tell her mother afterward. Austin's attorney then showed her a portion of the interview where she told Cordle that Austin peed in her mouth. During this questioning, A.M. stated, "Nothing came out of his private. That's what I'm trying to tell you."

Austin was the final witness. He testified that he was now 16 years old but was 14 or 15 years old when he last lived with Brian. He said that his mother was the first person to tell him that A.M. had accused him of sexual assault but he could not remember when she told him. He stated that no one ever confronted him about the accusations nor asked if they were true. He also denied admitting to them. He then testified that he never sexually assaulted A.M., never had her lick his penis, never put his penis on her vagina, never touched her vagina, and never took his pants or underwear off around her.

Notably, Austin was unable to remember many details. Specifically, he could not remember the date he last lived with Brian, what his house looked like, whether there was a time he was prohibited from staying with Brian, when the sleeping arrangements changed at Brian's house, when A.M. had accused him of sexually assaulting her, and when the last time he saw A.M. was. He also did not recall Alexandria's testimony about him admitting to the accusations. Additionally, he was not able to remember the name of his therapist nor recall any conversations he had with him about the allegations.

After Austin testified, his attorney made offers of proof as to what Elizabeth, Brian, Clemons, and Amy Ekstrom would have testified to if they had been allowed to be called as witnesses. The offers of proof claimed that Elizabeth would have testified that Austin was never prohibited from going to Brian's home, that she never had any concerns regarding sexualized behaviors from Austin, and that A.M.'s allegations were only made after Alexandria and Brian broke up. Brian would have testified that Austin lived with him on a week-on, week-off basis until March 2024 and that he never had any concerns regarding sexualized behaviors from Austin. Clemons would have testified that she was the DHHS worker who investigated A.M.'s allegations, that none of Austin's other siblings disclosed abuse after being interviewed, and that DHHS had marked A.M.'s allegations as unfounded in its registry. Lastly, Ekstrom would have testified she

was the forensic interviewer at Project Harmony who interviewed A.M. in August 2024 and that during the interview A.M. accused Austin of making her lick his private in the middle of the night.

On January 6, 2025, the court issued an order determining "[t]hat Count I of the Petition [was] true on proof beyond a reasonable doubt." In this conclusion, the court found Alexandria, Cordle, and Tippery's testimonies credible. It then articulated how it afforded Austin's testimony "some weight" although it lacked credibility because he could not recall material facts, events, and circumstances related to the accusations.

Austin now appeals.

## III. ASSIGNMENTS OF ERROR

Restated, Austin assigns the juvenile court erred by (1) disallowing him from calling certain witnesses in his defense; (2) disallowing him from adequately cross-examining the State's witnesses; (3) admitting and excluding certain evidence; (4) finding he committed first degree sexual assault against A.M. beyond a reasonable doubt; and (5) denying his motion for mistrial.

## IV. STANDARD OF REVIEW

Trial courts have broad discretion with respect to sanctions involving discovery procedures, and their rulings thereon will not be reversed in the absence of an abuse of discretion. *State v. Sierra*, 305 Neb. 249, 939 N.W.2d 808 (2020). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *State v. Jeremiah T.*, 319 Neb. 133, 21 N.W.3d 313 (2025).

An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error. *State v. Patton*, 287 Neb. 899, 845 N.W.2d 572 (2014).

Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Hernandez v. Dorantes*, 314 Neb. 905, 994 N.W.2d 46 (2023).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. *State v. Portillo*, 33 Neb. App. 660, 22 N.W.3d 679 (2025). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the trial court has abused its discretion. *Id.*

## V. ANALYSIS

### 1. CALLING DEFENSE WITNESSES

Austin first argues the juvenile court violated his 5th, 6th, and 14th Amendment rights under the U.S. Constitution by precluding him from calling witnesses in his defense. Because his

argument only specifically addresses his inability to call his mother and father as witnesses, we limit our consideration to whether the juvenile court abused its discretion in not allowing Austin to call Elizabeth and Brian as witnesses.

The U.S. Supreme Court has established that the 6th Amendment does not provide an absolute right to call witnesses; rather, the defendant's right is weighed against the concerns of the State to have a fair and efficient administration of justice. *State v. Sierra*, 305 Neb. 249, 939 N.W.2d 808 (2020). The Nebraska Supreme Court has considered the same concerns when determining whether other discovery sanctions violate the Nebraska Constitution. *Id.*

Neb. Rev. Stat. § 29-1912 (Supp. 2024) describes the types of information that are discoverable. Neb. Rev. Stat. § 29-1916 (Supp. 2024) provides the court discretion to grant reciprocal discovery. Neb. Rev. Stat. § 29-1919 (Supp. 2024) specifies that when a party has failed to comply with the discovery statutes, the court may (1) order such party to permit the discovery or inspection of materials not previously disclosed, (2) grant a continuance, (3) prohibit the party from calling a witness not disclosed or introducing in evidence the material not disclosed, or (4) enter such other order as it deems just under the circumstances. *State v. Sierra*, 305 Neb. 249, 939 N.W.2d 808 (2020). Under the plain meaning of § 29-1919, if a party fails to comply with discovery and give notice of an intent to call a witness, the court may prohibit that witness from being called. *State v. Sierra, supra.* Nothing in § 29-1919 suggests that the remedy cannot be extended to prohibiting multiple witnesses. *State v. Sierra, supra.*

Austin failed to file a final witness list by the imposed deadline. Moreover, the witness list he eventually filed did not disclose Brian as a potential witness. Due to these discovery violations, the court was well within its authority under § 29-1919 to prohibit Austin from calling Elizabeth and Brian as witnesses. Therefore, we determine the juvenile court did not abuse its discretion nor violate his rights by prohibiting him from calling his parents as witnesses in his defense.

## 2. CROSS-EXAMINATION OF A.M. AND ALEXANDRIA

Austin next argues the juvenile court violated his right to confrontation pursuant to the 6th and 14th Amendments of the U.S. Constitution by precluding him from adequately cross-examining the State's witnesses. Because his argument only specifically discusses how he was unable to adequately cross-examine A.M. and Alexandria, we limited our review to those witnesses.

The Nebraska Supreme Court has stated that whether rooted directly in the Due Process Clause of the 14th Amendment or in the Compulsory Process or Confrontation Clauses of the 6th Amendment, the federal Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. *State v. Ballew*, 291 Neb. 577, 867 N.W.2d 571 (2015). The functional purpose of the Confrontation Clause is to ensure the integrity of the factfinding process through the provision of an opportunity for effective cross-examination. *State v. Patton*, 287 Neb. 899, 845 N.W.2d 572 (2014). The right to confrontation means more than merely being allowed to confront the witness physically. *Id.*

However, "'[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'" *State v. Ballew*, 291 Neb. at 600, 867 N.W.2d at 589. In other words, the right is not unlimited, and only guarantees an opportunity for effective cross-examination, not cross-examination that is effective

in whatever way and to whatever extent the defense may wish. *State v. Patton, supra.* When the object of the cross-examination is to collaterally ascertain the accuracy or credibility of the witness, some latitude should be permitted, and the scope of such latitude is ordinarily subject to the discretion of the trial judge, and, unless abused, its exercise is not reversible error. *State v. Kuehn*, 273 Neb. 219, 728 N.W.2d 589 (2007).

An accused's constitutional right of confrontation is violated when either (1) he or she is absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, or (2) a reasonable jury would have received a significantly different impression of the witnesses' credibility had counsel been permitted to pursue his or her proposed line of cross-examination. *State v. Patton, supra.*

### (a) A.M.

Austin first argues he was prejudiced when he was unable to adequately cross-examine A.M. In this argument, he cites to the court sustaining the State's beyond the scope objection when A.M. was asked about her Project Harmony interview. He contends that he was prejudiced by this erroneous ruling because the court would have received a significantly different impression of A.M.'s credibility if she had been impeached with her forensic interview during cross-examination.

We determine the court abused its discretion by sustaining the State's beyond the scope objection and prohibiting Austin from impeaching A.M. with the statements she made during her forensic interview. Neb. Rev. Stat. § 27–611(2) (Reissue 2016) provides that "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." See *State v. Kuehn, supra.* The inconsistent statements from A.M.'s interview were clearly material to her credibility as a witness. Therefore, Austin should have been allowed to use those statements to impeach A.M. on cross-examination.

However, we cannot say Austin was prejudiced by this error. The admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020). Erroneous exclusion of evidence does not require reversal if the evidence would have been cumulative and other relevant evidence, properly admitted, supports the trial court's finding. *Id.* Austin was eventually able to impeach A.M. with her forensic interview when she was recalled as a defense witness. As such, any further impeachment using the forensic interview would have been cumulative to her later testimony. Because Austin was eventually allowed to impeach A.M. with the forensic interview, we cannot say that he was absolutely prohibited from engaging in otherwise appropriate cross-examination nor denied an opportunity for the court to receive a significantly different impression of A.M.'s credibility. Therefore, we determine the court's evidentiary rulings did not violate his right to confrontation.

### (b) Alexandria

Austin next argues he was prejudiced because he was unable to adequately cross-examine Alexandria. He first addresses the following portions of her testimony:

> [Alexandria]: When we found out that night about the incident, [Austin] left for his mom's the next day. And [Brian] was supposed to have a conversation with her.

[Austin's Attorney]: Okay. Did you ever have a conversation with Austin's mom?

[Alexandria]: No, I did not. . . . [Brian] told me that I was not allowed to bring it up to her, that he would have a conversation with her on his time.

. . . .

[Austin's Attorney]: Okay. Did you follow up with [Brian] to see if he had had that conversation?

[Alexandria]: Yes, I did, and he told me he had.

[Austin's Attorney]: Okay. And you never followed up with Austin's mom about it?

[Alexandria]: No I did not.

[The State]: Object on relevance at this time. Your Honor.

[The Court]: Sustained. The answer is stricken.

. . . .

[Austin's Attorney]: Okay. And then March 2024 is when you moved out of the house?

[Alexandria]: When myself, A.M. and [Alexandria's son] moved out.

[Austin's Attorney]: Okay. Why did you move out?

[Alexandria]: Because [Brian] and I split up.

[Austin's Attorney]: Okay. Why did you split up?

[The State]: Objection. Relevance.

[The Court]: Sustained.

Austin argues the juvenile court erred in ruling that these lines of inquiry were not relevant. He essentially contends they were relevant because he was attempting to establish a motive as to why Alexandria waited more than a year, and after she broke up with Brian, to report A.M.'s accusations. Neb. Rev. Stat. § 27-401 (Reissue 2016) provides that "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

We determine the juvenile court did not abuse its discretion in ruling that these questions were irrelevant. Whether Alexandria ensured that Brian told Austin's mother about A.M.'s accusations was not of consequence to whether Austin subjected A.M. to first degree sexual assault. The reason for Alexandria and Brian's breakup was similarly inconsequential. Therefore, we cannot say the juvenile court's rulings were untenable or unreasonable.

Austin next cites another portion of Alexandria's testimony where he contends that he was unable to adequately cross-examine her. During this part of the adjudication, his attorney asked Alexandria whether she talked to law enforcement after A.M.'s forensic interview and how many times she took A.M. to Project Harmony. After each question, the State objected on the grounds that the inquiry was beyond the scope of direct examination and the court sustained the objections. Austin asserts he was prejudiced by these rulings because he was unable to further demonstrate A.M.'s inconsistent statements across multiple forensic interviews.

We determine the juvenile court did not abuse its discretion in sustaining the State's beyond the scope objections. Nowhere in Alexandria's direct examination did the State ask her about A.M.'s Project Harmony interviews. And in contrast to our prior finding regarding the use of a

- 8 -

forensic interview to impeach A.M., A.M.'s interviews did not affect Alexandria's credibility. Therefore, we cannot say the court's decisions were untenable or unreasonable.

For these reasons, we determine that Austin was not absolutely prohibited from engaging in otherwise appropriate cross-examination of Alexandria, nor denied an opportunity for the court to receive a significantly different impression of her credibility. As such, we determine the relevant evidentiary rulings did not violate Austin's right to confrontation.

### 3. ADMISSION AND EXCLUSION OF EVIDENCE

In his third assignment of error, Austin broadly asserts the juvenile court erred "in its admission and exclusion of certain evidence." Brief for appellant at 8. He then proceeds to argue various instances where the court purportedly made erroneous evidentiary rulings, either admitting or excluding certain evidence.

He claims there were "outside the scope objections" that were sustained or denied. Brief for appellant at 49. However, he acknowledges that these rulings are discretionary to the trial court and will be upheld on appeal unless there is an abuse of discretion. See *State v. Kuehn*, 273 Neb. 219, 728 N.W.2d 589 (2007) (scope of cross-examination of witness rests largely in discretion of trial court and its ruling will be upheld on appeal unless there is abuse of discretion). We find no abuse of discretion in the juvenile court's rulings as to these particular objections raised by Austin, nor was Austin prejudiced by the court's rulings, as discussed further below.

Austin also complains about the juvenile court (1) sustaining the State's objection to his question related to the "toy closet at Project Harmony," (2) overruling his objection to the State asking the Project Harmony forensic interviewer about the impact of A.M.'s age regarding her believability, (3) "excluding evidence due to leading questions" during his case in chief since A.M. "was clearly an adverse party," and (4) denying him the ability to show inconsistencies between A.M.'s two Project Harmony interviews and her testimony at trial. Brief for appellant at 50-51. He contends these "several errors" in the admission or exclusion of evidence "resulted in extreme prejudice" to him. *Id*. at 51.

Regardless of the alleged incorrectness of the juvenile court's evidentiary rulings as to the instances pointed out by Austin, we disagree that those rulings resulted in prejudice to him. Austin's arguments largely go to his efforts to discredit A.M. and other adverse testimony, and the juvenile court specifically observed that A.M.'s testimony was "clear, straight to the point, descriptive, consistent, and credible throughout the trial." It also noted that despite A.M.'s "affection" for Austin, "her testimony regarding the sexual assault was steadfast, and her expressions of affection toward the juvenile and his father exhibited a lack of bias against [Austin]." The court gave "the greatest weight" to A.M.'s testimony and found the testimonies of the other State's witnesses to be credible. It found Austin's testimony, however, to lack credibility, given his "inability to recall material facts, events, and circumstances related to the allegations." Accordingly, we find no reversible error in the evidentiary rulings challenged by Austin.

### 4. SUFFICIENCY OF EVIDENCE

Austin next assigns that the juvenile court erred in finding there was sufficient evidence to determine beyond a reasonable doubt that he subjected A.M. to first degree sexual assault. He

essentially argues the State failed to present any evidence regarding A.M.'s lack of consent and that A.M.'s accusations were too inconsistent to be believed.

(a) Elements of Charged Offense

We first address an issue Austin raises concerning the crime he was charged with. Relevant to this matter, a person commits first degree sexual assault pursuant to Neb. Rev. Stat. § 28-319(1) (Reissue 2016) when they subject another person to sexual penetration (a) "without the consent of the victim" or when they (b) "knew or should have known that the victim was mentally incapable of resisting or appraising the nature of his or her conduct."

Austin points out that although § 28-319 provides two ways for the State to prove first degree sexual assault, the State's petition only alleged he "subject[ed] A.M. to sexual penetration, without the consent of A.M., in violation of . . . § 28-319(1)." Notably absent from this allegation is any language concerning A.M. being incapable of resisting or appraising the nature of the conduct and Austin's potential knowledge of that incapacity. With this, Austin raises an argument that because he was only charged under § 28-319(1)(a), the only way the State could have proved he committed first degree sexual assault against A.M. was by showing he sexually penetrated her without her consent.

Although a juvenile adjudication is not a criminal prosecution, where the juvenile is in jeopardy of having his or her freedom curtailed, the notice protections guaranteed by due process are the same as for a criminal defendant. *In re Interest of Steven V.*, 33 Neb. App. 256, 14 N.W.3d 18 (2024). Due process requires that an information must inform the accused with reasonable certainty of the crime charged so that the accused may prepare a defense to the prosecution and, if convicted, be able to plead the judgment of conviction on such charge as a bar to a later prosecution for the same offense. *In re Interest of Jordan B.*, 300 Neb. 355, 913 N.W.2d 477 (2018).

Generally, to charge a defendant with the commission of a criminal offense, the information or complaint must allege each statutorily essential element of the crime charged, expressed in the words of the statute which prohibits the conduct charged as a crime, or in language equivalent to the statutory terms defining the crime charged. *Id.* Where an information alleges the commission of a crime using language of the statute defining that crime or terms equivalent to such statutory definition, the charge is sufficient. *Id.* However, when the charging of a crime in the language of the statute leaves the information insufficient to reasonably inform the defendant as to the nature of the crime charged, additional averments must be included to meet the requirements of due process. *Id.*

While the State's petition only utilized language from § 28-319(1)(a), we observe that Austin never raised this issue with the juvenile court. As a general rule, an appellate court will not consider an argument or theory that is raised for the first time on appeal. *State v. Kruse*, 303 Neb. 799, 931 N.W.2d 148 (2019). Because this issue was never brought before the juvenile court by means of a pretrial motion or a motion made at the close of the State's case or the close of all evidence, the court never addressed whether Austin was properly charged under both prongs of § 28-319(1). Illustrative of this was the juvenile court's order that simply determined that "Count I of the Petition [was] true on proof beyond a reasonable doubt." Notably, this determination does not indicate which theory of first degree sexual assault the State proved. Accordingly, we do not

address this argument on appeal and will consider whether there was sufficient evidence under either prong of § 28-319(1) to adjudicate Austin as having committed first degree sexual assault.

(b) Sufficiency of Evidence

Austin asserts there was insufficient evidence to find that he committed first degree sexual assault under both theories of § 28-319(1) because the State failed to present any evidence of A.M.'s lack of consent, her incapacity to consent, or his knowledge of that incapacity. He also asserts there was insufficient evidence because A.M.'s accusations were inconsistent, her testimony contradicted her prior accusations, she admitted to having lied in the past, and there was a significant amount of time between A.M. making her accusations and the adjudication.

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. *State v. Portillo*, 33 Neb. App. 660, 22 N.W.3d 679 (2025). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

As stated, and as relevant to this matter, a person commits first degree sexual assault pursuant to § 28-319(1) when they subject another person to sexual penetration (a) without the consent of the victim, or (b) when they knew or should have known that the victim was mentally incapable of resisting or appraising the nature of his or her conduct. Neb. Rev. Stat. § 28-318(6) (Supp. 2024) defines sexual penetration as:

> [S]exual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of a part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical, non-health, or nonlaw enforcement purposes. Sexual penetration shall not require emission of semen.

*(i) Sexual Penetration*

Austin essentially argues that a rational trier of fact could not have concluded he sexually penetrated A.M. beyond a reasonable doubt because her accusations were inconsistent, her testimony contradicted her prior accusations, she admitted to having lied in the past, and there was a significant amount of time between A.M. making her accusations and the adjudication.

We determine that when viewed in the light most favorable to the prosecution, a rational trier of fact could have found that Austin subjected A.M. to sexual penetration beyond a reasonable doubt. Throughout her disclosure to Alexandria, forensic interview, medical examination, and testimony, A.M. consistently alleged that Austin made her perform oral sex on him. She stated that she was fully clothed during the incident, that Austin was not wearing any shorts, that his penis "tasted weird," felt "disgusting," and was long and hard. Additionally, she was able to mimic the appearance of an erect penis by stacking her fists on top of each other near her genitals. This testimony was further supported by Alexandria, Cordle, and Tippery all confirming that A.M. had alleged that Austin made her "lick" or "suck" his penis.

- 11 -

However, we note that other portions of A.M.'s accusations were inconsistent. These inconsistencies include whether anything came out of Austin's penis, whether he touched her vagina with his mouth, whether she was clothed when he touched her vagina with his mouth, whether he bit her vagina, whether he vaginally penetrated her, and the number of times the abuse occurred. But despite these inconsistencies, A.M.'s allegations remained relatively consistent regarding her having performed oral sex on Austin. Therefore, under the requisite standard, we determine the evidence concerning A.M. performing oral sex on Austin was sufficient for a rational trier of fact to conclude that Austin sexually penetrated A.M. beyond a reasonable doubt.

### (ii) Lack of Consent or Incapacity

Austin next asserts the State failed to present any evidence that he sexually penetrated A.M. without her consent or while he knew or should have known that she was incapable of resisting or appraising the nature of his conduct.

In response to Austin's arguments, the State cites *In re Interest of Gunner B.*, 312 Neb. 697, 980 N.W.2d 863 (2022). In that case, an 11-year-old was charged with third degree sexual assault for subjecting a 5-year-old to sexual contact. Notably, Neb. Rev. Stat. § 28-320 (Reissue 2016), which defines third degree sexual assault, utilizes the same language as § 28-319. Both statutes prohibit the respective conduct when it is done (a) without the consent of the victim or (b) when the perpetrator knew or should have known that the victim was mentally or physically incapable of resisting or appraising the nature of his or her conduct. See, § 28-319; § 28-320.

In discussing whether the 5-year-old victim was incapable of resisting or appraising the sexual contact, the Supreme Court stated, "that common sense alone establishes that a child of 5 or 6 years of age is among those that are 'indisputably' under an age when children are capable of appraising the nature of sexual conduct." *In re Interest of Gunner B.*, 312 Neb. at 702, 980 N.W.2d at 867. The court then addressed whether the 11-year-old offender knew or should have known about the victim's lack of capacity. It ultimately determined that because the offender knew the victim's age and had denied the allegations, he demonstrated knowledge that such behavior was not acceptable. With this, the court concluded that the 11-year-old knew or should have known the victim was mentally incapable of resisting or appraising the nature of his conduct.

We find *In re Interest of Gunner B, supra*, persuasive as to whether Austin knew or should have known that A.M. was mentally or physically incapable of resisting or appraising the nature of his conduct. If children aged five or six are "indisputably" below the age at which they can appraise the nature of sexual contact for purposes of third degree sexual assault, they are at least equally, if not more so, incapable of appraising the nature of sexual penetration. Accordingly, we determine the State adequately proved that A.M. was mentally incapable of appraising the nature of the sexual conduct at issue.

We next determine that when viewed in the light most favorable to the prosecution, a rational fact finder could have determined that Austin knew or should have known about A.M.'s lack of capacity. The evidence demonstrated that Austin identified A.M. as his little sister and offered her money and a sucker to perform oral sex on him. The evidence also showed that Austin did not remember when A.M. made the accusations, whether he was subsequently barred from living in Brian's house, any conversations he had with his therapist about A.M.'s allegations, and Alexandria's testimony about him admitting to the sexual abuse.

We also note that although Alexandria testified that Austin had admitted to the accusations, Austin denied ever doing so. An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. *State v. Portillo*, 33 Neb. App. 660, 22 N.W.3d 679 (2025). We observe that the juvenile court found Alexandria's testimony credible while it only afforded Austin's "some weight." Therefore, under the requisite standard and while accepting the juvenile court's credibility determinations, we view the evidence as demonstrating that Austin previously admitted to the sexual abuse. Accordingly, the evidence shows that Austin denied the accusations after previously admitting to them.

We determine that Austin not remembering key details and denying the accusations after having previously admitting to them suggest an awareness that such behavior was not acceptable. We therefore determine there was sufficient evidence for a rational trier of fact to find that Austin knew or should have known A.M. was mentally incapable of resisting or appraising the nature of his conduct. As such, when viewed in the light most favorable to the State, we conclude that a rational trier of fact could have determined that Austin committed first degree sexual assault against A.M.

### 5. MISTRIAL

In Austin's last assignment, he asserts the juvenile court erred by denying his motion for mistrial.

A mistrial is properly granted in a criminal case where an event occurs during the course of trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Portillo, supra*. In order to prove error predicated on the failure to grant a mistrial, the defendant must prove the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. *Id.* In the context of a denial of a motion for mistrial, actual prejudice means prejudice that is "'[e]xisting in fact; real.'" *Id.* at 685, 22 N.W.3d at 701-02. In defining the term, the Supreme Court has drawn on its meaning in similar legal contexts to determine that actual prejudice requires "'a reasonable probability that, but for [the] errors, the result of the proceeding[s] would have been different.'" *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Austin's motion for mistrial was based on the court's alleged cumulative misconduct. His reasons included (1) the court prohibiting him from properly cross-examining A.M. and Alexandria, (2) the court prohibiting him from calling material witnesses in his defense, (3) the revelation that the disc containing A.M.'s forensic interview was broken, and (4) the court referring to A.M. as "sweet girl."

We determine the court did not abuse its discretion in denying Austin's motion for mistrial. As discussed previously, Austin was not prejudiced by the juvenile court prohibiting him from cross-examining A.M. because he was later able to recall her as a witness. He also did not suffer prejudice when the court prohibited him from cross-examining Alexandria because the court's evidentiary rulings did not constitute abuses of discretion. Similarly, Austin's inability to call material witnesses in his defense did not necessitate a mistrial because the prohibitions were properly imposed as discovery sanctions.

This leaves Austin's assertions that a mistrial was warranted because the disc containing A.M.'s forensic interview was broken and the court referred to A.M. as "sweet girl." We determine Austin is unable to demonstrate he was prejudiced by the broken disc because a continuance was granted for him to acquire a new copy. Because this new disc was obtained and eventually used to impeach A.M., we determine that Austin did not suffer any actual prejudice from the incident. Lastly, we cannot say that the court's single reference to A.M. as "sweet girl" exhibited bias to such a degree that a mistrial was warranted. Therefore, we conclude the court did not abuse its discretion in denying Austin's motion for mistrial.

## VI. CONCLUSION

We determine the juvenile court did not violate Austin's right to confront A.M. and Alexandria and did not abuse its discretion in prohibiting him from calling witnesses in his defense. We also determine the court did not err in determining the State met its burden to prove that Austin sexually penetrated A.M. when he knew or should have known that she was mentally incapable of resisting or appraising the nature of his or her conduct. Lastly, we conclude the court did not abuse its discretion in denying Austin's motion for mistrial. Therefore, the order of the juvenile court is affirmed.

AFFIRMED.